PAUL W. HOLTZMAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Holtzman v. Commissioner
Docket Nos. 2774-76, 2775-76, 2776-76.
United States Tax Court
T.C. Memo 1980-174; 1980 Tax Ct. Memo LEXIS 409; 40 T.C.M. (CCH) 350; T.C.M. (RIA) 80174; May 19, 1980, Filed *409 Eli H. Schmukler and Ralph W. Bushnell, for the petitioners. James F. Kidd, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax under section 6653(b), I.R.C. 1954, [2] for the years and in the amounts as follows: Additions to Tax
Deficiencies
I.R.C. 1954
Year
in Income Tax
Sec.6653(b)
Jon Holtzman
1971
$39,878.36
$19,939.18
1972
28,914.26
14,457.13
1973
36,794.87
18,397.44
Paul W. Holtzman
1971
$20,662.36
$10,331.18
1972
10,603.67
5,301.84
1973
18,100.82
9,111.91
Many of the issues raised by the pleadings have been settled by agreement of the parties, leaving for our decision the fair market value of 59 Greek coins referred to as "Radiant Heads" and 190 Greek coins referred to as "Eagles" as of December 15, 1971; the fair market value of a Greek coin referred to as a "Soli in Calicia stater" and a Greek coin referred to as a *410 "Lycia stater" as of December 15, 1972; and the fair market value of a gold coin referred to as a "half stater" and a gold coin referred to as a "stater" as of December 9, 1972. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Jon Holtzman, who resided in Madison, Wisconsin, at the time of the filing of his petition in this case, filed individual Federal income tax returns for the calendar years 1971, 1972 and 1973 with the Office of the Internal Revenue Service at Kansas City, Missouri. On December 11, 1973, he filed an amended tax return for the calendar year 1971 with the Internal Revenue Service Center in Kansas City, Missouri. Paul W. Holtzman, who resided in Madison, Wisconsin, at the time of the filing of his petition in this case, filed individual Federal income tax returns for the calendar years 1971 and 1973 with the Office of the Internal Revenue Service at Ogden, Utah. During 1972, Paul W. Holtzman was married to Valerie Holtzman and for the calendar year 1972 they filed a joint Federal income tax return with the Office of the Internal Revenue Service in Ogden, Utah. Paul Holtzman filed an amended tax return for the calendar *411 year 1973 on April 11, 1974. On December 15, 1971, Jon made a charitable contribution of a collection of 59 Rhodian drachms (Radiant Heads) and a collection of 190 Rhodian-type drachms (Eagles) to the Field Museum of Natural History in Chicago, Illinois. Jon had purchased the collection of Radiant Heads and Eagles on November 5, 1970, for $4,180. On December 15, 1972, Jon made a charitable contribution to Loyola University of Chicago of a group of 283 coins, among which were two coins, one referred to as a "Soli in Calicia stater" and one as a "Lycia stater." On December 9, 1972, Jon and Paul jointly contributed a group of four coins to Loyola University of Chicago, two of which were gold coins, hereinafter referred to as a "gold stater" and a "gold half stater." Jon's share of the contribution of the two gold coins is 40 percent of the fair market value of the coins and Paul's share is 60 percent. The Radiant Heads and the Eagles contributed by Jon to the Field Museum of Natural History are silver ancient Greek coins. Four of the Radiant Heads were of the highest quality and ten others would be classed as being in extremely fine condition. The remainder were in fine to *412 very fine condition. Although the 190 Eagles were not in as fine condition as the Radiant Heads, a few of them at the time of the gift would be classed as very fine and the balance as fine. At the time of the gift of the Radiant Heads and Eagles in 1971, there were only approximately 220 Eagles known to be in existence. At the time of the trial there were only 250 Eagles known to be in existence. Ancient Greek coins were hand-produced by means of being struck between two intaglio dies. The larger die would be held in or be a part of a large anvil. The smaller die was part of a long punch, also made of metal. The obverse impression on the coin was made by the larger die and the reverse side of the coin by the smaller die or punch. In striking a coin in this ancient manner the blank would be placed on the anvil with the punch positioned on top. The punch would be struck one to several strikes with a heavy instrument such as a sledge hammer and the impression on the coin would thereby be made. Ancient coins made in this manner are of a scyphate nature, one side being concave and the other bowed. Because each ancient Greek coin was handmade in the manner above described, no *413 two are exactly alike. Coins produced from the same die or a similar die might superficially appear to be exactly alike but upon close examination, particularly under magnification, differences can be seen. Ancient Greek coins are considered and valued today as works of art and as an example of ancient Greek art. Greek coins are generally more valuable than Roman coins because of being viewed by collectors as more beautiful coins and the epitome of the die cutter's art. Many collectors of ancient coins attempt to acquire type sets, each coin being of a completely different design, such as a facing head as compared to a profile. With respect to coins that are otherwise comparable, the finer the condition of the coin the more valuable it is. Various grades are used by persons offering coins for sale and by collectors to designate the condition of a coin. The grade F.D.C. is the highest grade. This grade is effectively comparable to that of an uncirculated coin of more modern times, and a coin graded as F.D.C. is at least two grades above a coin that is graded VF (very fine), the grade in-between being EF (extremely fine). During the years 1970, 1971, and 1972, there was a *414 steady rise in the price of ancient coins. In 1973, concurrent with the devaluation of the dollar, the market for ancient coins experienced a more rapid growth, the largest increase in price being for the top quality coins. The Furopean market for ancient coins is slightly higher priced than the American market. Bank Leu Ag Zurich (Bank Leu) and Munzen und Medaillen are the two most important firms in the world dealing in ancient coins. Each of these institutions puts out a catalog with respect to the coins it has available for sale at its annual auction and in this catalog shows a suggested or estimated price. When sold at auction the coins listed in the catalogs sometimes bring more than the suggested price and sometimes bring less. Some dealers in ancient Greek coins publish a fixed price catalog which is effectively an offer to sell any coin listed therein for the price shown. The following schedule shows the listing of some Radiant Heads in the indicated catalog at the indicated price, as well as the condition of the coin as stated in the catalog: 1. Ancient Coins - Robert J. Myers and Francis M. Schwartz - Catalog dated May 15, 1972. RHODES, RHODUS Hemidrachm, 166-88. *415 Head of Helios three-quarters right/rose, magistrate's name, all in incuse square. BMC 300 VF- 50 2. Munzen und Medaillen A.G. - Catalog dated January 1972. Ile de Rhodes. Vers. 150. Triobole. Tete radiee d'Helios de face, legerement tournee vers la d. Rv. P-O Rose, dans le champ a.g., une etoile; nom de magistrat: ANT--AIE 1, 41 g. Hunter II, 442, 59 F.d.c. 350 francs [$90] Although the list is in French, the description is of a coin comparable to a few of the best Radiant Heads here involved. 3. Artemis Antiquities - Treasure Island, Florida - C.H. Schroeder, ANA, ANS, FUN - No. VIII - [Undated, but the evidence shows that this catalog was issued sometime in 1976.] -, -, 166-88 B.C., AR drachm. Hd. of Helios, radiate, r. Rv. PO Rose with bud, head-dress of Isis to 1., magistrates name above. BMC 253 VF 75.00 -, -, AR drachm. Similar, but symbol bucranium to 1. BMC 288 nice good VF 90.00 In the latter part of 1971, Radiant Heads, depending on their condition and quality, ranged in price from approximately $35 for a fine quality to $90 for the very finest quality. A relatively large number of Radiant Heads have been preserved and therefore they are common *416 coins. Because of the scarcity of Eagles, not many were listed in the various catalogs. However, two were listed in the 1976 Artemis Antiquities, Treasure Island, Florida, catalog No. VIII, referred to above, as follows: -, Rhodian Dependenices, 309-166 B.C.,
AR drachm. Hd. of Helios facing, right
cheek covered by eagle. Rv. Rose with
branch and bud. BMC 210 var. RARE, nearly EF
175.00
-, -, Similar, but rose with branch and
bud on both sides and letters MA. BMC--;
SNG von Aulock 2865 RARE, VF
145.00
There were a number of Cilician (Soli) staters and Lycia staters offered for sale by various coin dealers during the years 1971 and 1972. The following schedule shows the name and date of the catalog, the dollar price, and the description of all Soli staters offered for sale in the indicated catalogs: CILICIAN (SOLI) STATERS
Coin
Catalog
Price
Description
Soli-Pompeiopolis
Robert J. Myers
$ 300
Fine - very fine
Stater, 400-350 B.C.
November 1971
Soli-Pompeiopolis
Robert J. Myers
150
Fine - very fine
AE of 66 B.C. to 1st
November 1971
century A.D.
Soloi
Bank Lue Ag Zurich
4,924
Rare, especially fine
Stater 420 B.C.
May 1973
design; extremely fine
Soli
Superior Stamp &
675
Extremely rare
AR Stater 450-386 B.C.
Coin Co.
(estimated)
October 1971
575
(bought at)
Solio
Bank Leu Ag Zurich
153
Very fine
Stater 400 B.C.
May 1970
Solio
Bank Leu Ag Zurich
690
Extremely fine
Stater 380 B.C.
May 1970
Solio
Bank Leu Ag Zurich
193
Rare variety;
Stater 350 B.C.
May 1970
extremely fine
Celeneris
Robert J. Myers
125
Very fine
Stater 450-400 B.C.
November 1971
Celeneris
Robert J. Myers
150
Very fine to extremely
Stater (similar to
November 1971
fine
above)
Mallos Under Tiribazos
Robert J. Myers
450
Fine to
very fine.
A
Stater 386-380 B.C.
November 1971
rare coin bearing the
name of Satrap and City
Nagidus
Robert J. Myers
300
Apparently unpublished
Stater 356-350 B.C.
November 1971
Extremely fine
Nagidus
Robert J. Myers
325
Very fine to extremely
Stater (similar to
November 1971
fine
above)
Tarsus
Robert J. Myers
200
Extremely fine
Stater 378-372 B.C.
November 1971
Tarsus
Robert J. Myers
60
Fine
Stater (similar to
November 1971
above)
Tarsus
Robert J. Myers
200
Sharp - very fine
Stater 378-372 B.C.
November 1971
*417 The following schedule shows the name and date of the catalog, the dollar price and the description of all Lycia staters offered for sale in the indicated catalogs: LYCIAN STATERS
Coin
Catalog
Price
Description
Kheriga
Bank Leu Ag Zurich
$ 926
Of great rarity; very
Stater 400 B.C.
April 1972
fine example
Unbestimmte Dynasten
Bank Leu Ag Zurich
2,886
Magnificent
specimen
Stater 500 B.C.
May 1973
Unbestimmte Dynasten
Bank Lue Ag Zurich
1,019
Extremely fine
Stater 490 B.C.
May 1973
Unbestimmte Dynasten
Bank Leu Ag Zurich
3,141
Of great rarity;
until
Stater 450 B.C.
May 1973
now only published once.
Extremely fine.
Khin…
Bank Leu Ag Zurich
1,019
Extremely fine
Stater 450 B.C.
May 1973
Tathivaibi
Bank Leu Ag Zurich
11,545
Of great rarity & artful
Stater 440 B.C.
May 1973
design; magnificent specimen
Mithrapata
Bank Leu Ag Zurich
1,087
Extremely fine
Stater 370 B.C.
May 1973
Perikles
Bank Leu Ag Zurich
7,131
Of very rare & unusual
Stater 370 B.C.
May 1973
design
Tetrobol
Robert J. Myers
225
Fine - very fine
Stater 460 B.C.
May 1972
Taththivaibi
Superior Stamp &
125-150
Very fine; very rare
Stater 480-460 B.C.
Coin Co. Oct. 1971
Kubernis (?)
Robert J. Myers
275
Fine
Stater 520-480 B.C.
May 1972
Phaselis
Robert J. Myers
700
Very fine
Stater 550-480 B.C.
May 1972
Perikles
Robert J. Myers
1,200
Very fine
Stater 400-362 B.C.
May 1972
Phaselis
Bank Leu Ag Zurich
$ 416
Rare and very fine
Stater 520
B.C.
May 1970
Phaselis
Bank Leu Ag Zurich
435
Extremely fine
Stater 260 B.C.
May 1970
Stater 500-440 B.C.
Robert J. Myers
350
Fine; extra fine
November 1971
Phaselis
Robert J. Myers
225
Very fine
Stater 3rd century
November 1971
B.C.
*418 The following schedule shows the name and date of the catalog, the dollar price and the description of Cilician staters (other than Soli) offered for sale in the indicated catalogs: CILICIAN STATERS (OTHER THAN SOLI)
Coin
Catalog
Price
Description
Kelenderis
Bank Leu Ag Zurich
$ 883
Extremely fine
Stater 410 B.C.
April 1972
Tarsos
Bank Leu Ag Zurich
1,994
Utmost rarity; actually
Stater 430 B.C.
April 1972
the second published
example
Cilicia, Tarsus
Robert J. Myers
125
Very fine
Stater 361-333 B.C.
May 1972
Cilicia, Tarsus
Robert J. Myers
180
Very fine
Stater 361-333 B.C.
May 1972
Kelenderis
Bank Leu Ag Zurich
5,433
Finest design; magnificent
Stater 410 B.C.
May 1973
specimen
Nagidos
Bank Leu Ag Zurich
3,481
Utmost rarity; actually the
Stater 380 B.C.
May 1973
second known example; very
fine
Tarsos
Bank Leu Ag Zurich 1,324
Utmost rarity; very
Stater 379-374 B.C.
May 1973
fine
Tarsos
Bank Leu Ag Zurich
951
Finely done; extremely
Stater
May 1973
fine
Tarsos
Bank Leu Ag Zurich
1,528
Good design; extremely
Stater 378-372 B.C.
May 1973
fine
Celenderis
Robert J. Myers
175
Very fine
Stater 450-400 B.C.
May 1972
Tarsus
Robert J. Myers
225
Extremely fine
Stater 361-333 B.C.
May 1972
Tarsus
Robert J. Myers
150
Extremely fine
Stater 361-333 B.C.
May 1972
Kelenderis
Bank Leu Ag Zurich
537
Very fine - extremely
Stater 380 B.C.
May 1970
fine
Mallos
Bank Leu Ag Zurich
1,049
Rare. Satrap head of fine
Stater 375 B.C.
May 1970
style & clear portrait.
Extremely fine.
Tarsos
Bank Leu Ag Zurich
486
Very rare. Very fine.
Stater 400 B.C.
May 1970
Tarsos
Bank Leu Ag Zurich
416
Extremely fine.
Stater 378-372 B.C.
May 1970
Tarsos
Bank Leu Ag Zurich
416
Extremely fine.
Stater
May 1970
Tarsos
Bank Leu Ag Zurich
844
Magnificent specimen.
Stater 361-333 B.C.
May 1970
Tarsos
Bank Leu Ag Zurich
409
Extremely fine.
Stater 333 B.C.
May 1970
*419 The Soli stater donated by Jon to Loyola University on December 15, 1972, was in good condition. There are a number of Soli staters in existence, each with slight differences. The donated Soli stater has a different magistrate on it from most of the Soli staters now in existence. The rarity and design of a Soli stater as well as the condition of the coin affects its value. The donated Soli stater is of good design and is in good condition. The Lycia stater donated by Jon to Loyola University is a silver coin of rare design with the design on the obverse being particularly unusual. There are a considerable number of varieties of Lycia staters of the approximate date of the donated Lycia stater which have designs with slight changes. Some designs are more rare than others and the rarity of the design affects the value of the coin. The Lycia stater contributed by Jon to Loyola University of Chicago had a chisel mark or test cut on it and showed wear on the obverse side. Generally a chisel mark decreases the value of an ancient Greek coin. The gold coins of ancient Greece have a high gold content. The coin referred to as the gold stater is in very worn condition. Its *420 weight is 8.55565 grams. It bears the signs of coins issued by Philip II of Macedonia from the City of Philippi. Philip II was the father of Alexander the Great. Macedonian coins of Philip II date from 359 to 336 B.C., and Macedonian coins of Alexander the Great date from 336 to 323 B.C. There are other gold Philippi staters that are known to be in existence and there have been sales of gold Philippi staters of the same size and same general design as the gold stater here involved. From spectrographic analysis, the gold stater appears to be of the composition of 95 percent gold, 1.2 percent silver, 0.5 percent copper, and 0.15 percent iron. When immersed in perfluoro-1-methyl decalin for measurement of its specific gravity by the method of Hughes and Oddy (Archaeometry 12 (1970)) the indication is that the gold content is nearly 99.20 percent. Because of its purity, the coin is extremely soft and its surface has taken many scars. There is no remaining evidence of the original surface in the coin's etched and battered condition. One of the structs on the reverse side of the coin is either missing or is very dim. The gold half stater is about 13mm in diameter. The coin *421 was struck and at the bottom edge of the head there are areas of double striking indicated. From a spectrographic analysis the coin appears to consist of 93 percent gold, 0.8 percent silver, 0.3 percent copper, and 0.08 percent iron, with the remainder a mixture of minor elements. When immersed in perfluoro-1-methyl decalin for measurement of its specific gravity by the method of Hughes and Oddy (Archaeometry 12 (1970) (1-11) the indication is that the gold level is above 99 percent. The weight of the gold half stater is 3.6094 grams. The half stater has some appearances of coins from Northern Greece, particularly from Thasos. Gold coins from Northern Greece during the Macedonian era had a high gold content. There is some concavity to the gold half stater, but it is difficult to observe and less than the concavity observed generally in coins of the period 450 to 400 B.C. The following schedule shows the city of origin, the catalog in which advertised, the weight in grams, and the price in dollars of gold staters sold by the indicated company during the years 1970 through 1973, together with the description of the coin in the catalog in some instances: GREEK GOLD STATERS *422 Weight
Catalog
City
(grams)
Dollars
Description
Bank Leu Ag Zurich -
Calabria
8.58
$ 2,278
April 1972
Carthage
9.24
1,111
Olbia
8.43
854
Pantikapaion
9.08
10,395
Thrace
8.54
2,350
Thrace
8.44
1,196
Macedon
9.86
3,275
Extremely fine
Macedon
8.59
1,339
Philip II - extremely fine
Macedon
8.61
3,916
Philip II - rare variety
of finest style; magnificent
specimen
Macedon
8.57
883
Philip II - of Utmost
rarity; extremely fine
Macedon
8.63
1,111
Alexander the Great
stater F.D.C.
Bank Leu Ag Zurich -
Macedon
8.52
$ 911
Alexander the
Great - very
April 1972
rare; extremely fine
(continued)
Macedon
8.57
797
Alexander the Great - rare
variety; extremely fine
Macedon
8.63
1,025
Philip III; extremely fine
Macedon
8.54
627
Bosporus
7.74
683
Bosporus
7.82
655
Bosporus
7.64
456
Lampsakos
8.44
3,204
Bank Leu Ag Zurich -
Thrace
8.46
8,150
May 1973
Thrace
8.48
3,905
Thrace
8.45
4,754
Macedon
8.62
6,791
Philip II - F.D.C.
Macedon
8.55
2,377
Alexander III; extremely
fine
Macedon
8.62
5,433
Alexander III - F.D.C.
Macedon
8.53
4,924
Poliorketos; very rare;
extremely fine
Syria
8.51
7,640
Syria
8.52
6,791
Superior Stamp and
Boii
*
550
Coin Co., Inc. -
Macedon
*
500-575
Alexander III - superb
October 1971
mint state
Macedon
*
300-350
Alexander III - choice
very fine
Robert J. Myers -
Macedon
*
600
Alexander III - extremely
May 1972
fine; superb style
Macedon
*
525
Alexander III - very fine
Lysimachus
*
600
Bank Leu Ag Zurich -
Calabria
8.56
3,005
May 1970
Carthage
9.26
665
Pantikapaion
9.08
5,627
Lysimachus
8.52
767
Lysimachus
8.55
1,125
Macedon
8.60
2,046
Philip II; very rare;
extremely fine
Macedon
8.58
409
Philip II; extremely fine
Macedon
8.57
550
Philip II; extremely fine
Macedon
8.39
492
Alexander III; rare
variety; extremely fine
Macedon
8.59
921
Philip III; magnificent
specimen
Bank Leu Ag Zurich -
Macedon
8.60
$ 2,093 **
Philip v; of great
May 1970
rarity; actually the
(continued)
third known example
Aetolia
8.53
2,941
Bosporus
8.23
2,302
Bosporus
8.46
2,558
Bosporus
8.06
588
Ionia
8.43
1,483
Lydia
8.05
1,074
Syria
8.50
2,941
Robert J. Myers -
Macedon
*
375
Philip II; very fine
November 1971
Macedon
*
450
Alexander III;
extremely fine
Thrace
*
475
Thrace
*
325
*423 The following schedule shows the city of origin, the catalog in which advertised, the weight in grams, and the dollar price of various gold fraction coins sold or offered for sale during the years 1970 through 1973, together with the description of the coins in the catalog in some instances: Weight
Catalog
City
(grams)
Dollars
Description
Bank Leu Ag Zurich -
Lucania
2.61
$1,851
Auction 2
Lucania
1.30
869
April 1972
Lucania
2.80
1,452
Syracuse
4.24
1,139
Syracuse
3.59
797
Syracuse
4.25
940
Carthage
1.87
555
Carthage
0.92
214
Thasos
3.95
8,686
Hemidrachme. Of great
rarity & finest style.
Magnificent specimen
Macedon
2.12
627
Philip II - 1/4 gold stater.
Extremely fine.
Rhodes
3.32
1,424
Munzen Und Medaillen -
Pyrrhos
2.14
360
January 1972
Kroisos-Lydia
0.66
385
Bank Leu Ag Zurich -
Calabria
2.13
1,358
Auction 7
Sicily
1.49
2,292
May 1973
Sicily
1.14
5,942
Macedon
2.12
883
Variety of great rarity;
very fine-extremely fine
Macedon
1.08
1,290
Rare; extremely fine
Lydia
2.67
2,292
Thrace
8.46
8,150
[This is a stater] of great
rarity; very fine to
extremely fine
Superior Stamp and
Syracuse
*
500
Coin Co., Inc.
Caria
*
200
Auction
October 1971
Robert J. Myers
Locri
*
550
Auction 2
Epizephryii
May 1972
Syracuse
*
245
Syracuse
*
2,250
Syracuse
*
700
Rhodes
*
575
Bank Leu Ag Zurich -
Calabria
4.28
$1,714
Auction 45
Calabria
2.14
614
May 1970
Syracuse
1.15
460
Syracuse
0.68
639
Syracuse
5.71
895
Syracuse
4.21
563
Tauromenia
1.05
390
Carthage
1.83
230 *hThasos
3.93
5,179
Most outstanding rarity;
indeed unpublished;
magnificent specimen
Hyrtakira
0.91
358
Rhodes
2.05
384
Satrap of
Caria
1.39
575
Robert J. Myers -
Calabria
*
300
New York Auction 1
Syracuse
*
425
November 1971
*424 The half stater here involved is the weight of coin generally referred to as a gold fraction in various catalogs. Jon Holtzman on his 1971 Federal income tax return claimed among his deductions for donated property $25,000 designated "Rhodes." In an appraisal attachment the $25,000 was stated to be the fair market value of -- 190 Rhodian Drachm with eagle super-imposed over right cheek of Helios B.C. 304-189 [the Eagles] 59 Rhodian Drachm facing radiant head of Helios B.C. 304-189 [the Radiant Heads] On his 1972 Federal income tax return Jon Holtzman claimed as a deduction for a charitable contribution for donations other than cash the amount of $39,059.91. In explanation of this contribution was a total sum of $97,525.07, stated to have been donated in other than cash, which included the following: Contributions
* * * Loyola University of Chicago - Other Various Coins $44,950.00 Loyola University of Chicago (1) 4 Unique Gold Coins 30,000.00 (1) Taxpayer contributed a portion of the gold coins whose appraised value was $75,000.00. The remaining portion of the contribution will be deducted by Mr. Paul Holtzman. The *425 appraisal attached, showing how the $75,000 was arrived at, showed the following: Description
Value
1 Unique gold Stater of Philippi
ex Lambros Collection
1 Unique Thasos gold half Stater
ex Lambros Collection
1 Unique Bactria Tetradrachm of
Eucratides I
1 Unique Bactria Drachme of
Hermaeus and Calliope
as listed and described in detail on one (1)
attached sheet.
Total Value of the above items
$75,000
The description of the first two items was as follows: 1. Phillipi in Macedonia, Gold Stater, 358-340 B.C. Obv. Head of Herakles in lion skin. Rev. Claw-footed tripod with three handles, lion head and (in Greek) Philippoi. Ex Lambros Collection. Originally published in 1868 by Lambros in "The Gold Coins of Phillipi", this coin was part of a hoard of 9 similar pieces found some years before. Of the 9 known specimens of this coin only one has the lion head to right of tripod as its magistrate symbol. Most of the other pieces discovered at that time are now in national collections in Europe, such as Lenningrad, Stockholm, Paris, etc. and are off the market. All research indicates that this is the first time in fifty years that one of these coins *426 has changed hands. The coin is unique in its own right and one of the rarest and most desirable gold coins known. 2. Thasos, Gold half stater, 5th Century B.C. Obv. Female head with necklace. Rev. Cluster of grapes. Ex Lambros Collection. An unpublished gold half stater excavated by Professor Lambros himself in Thrace and never published. Both obverse and reverse of the coin represent completely unknown, unpublished coin types. The style of the coin makes dating in the 5th Century B.C. possible. An excellent coin for thorough research and publication with an outstanding provenance. Unique, rarity of the first degree. The description of the gold stater was in reference to the stater here involved, and the description of the gold half stater referred to the one here involved. The appraisal attached in support of the $44,950 value of other various coins included as items 7 and 8 the following: 7. Lycia, Dynasts of Kupilli 450-430 B.C., Stater. Obv. Winged bull with a bearded male head of the Achmenid (!) type. Rev. Circle with three wings and (in Greek) Koprile. Obv. type completely unique. Not in British Museum Collection, von Aulock, Weber or American Numismatic *427 Society. Similar rev. type in Pozzi. 1 Coin [the Lycia stater] 8. Soli in Cilicia, Stater, 450-386 B.C. Obv. Athena, Rev. Grapes and vine leaves, with small cluster of grapes next to a large one and (in Greek) SOLI. Rare, Variety in British Museum, von Aulock or Weber. Unique. 1 Coin [the Soli stater] Paul W. Holtzman on his joint 1972 Federal income tax return claimed a deduction for contributions other than cash of $20,687, which was explained on Schedule 1 of his return to be derived from contributions other than in cash totaling $57,216, with the deduction limited to $20,687. Among the total claimed contributions was the following: Coin collection donation to Loyola Univ. at Chicago. * * * Paul Holtzman's share -- $45,000 The appraisal attached arriving at the $75,000 over-all value of coins, which included the gold stater and the gold half stater, was a copy of the same appraisal attached to Jon Holtzman's 1972 return. Respondent in his notice of deficiency to Jon Holtzman for the years 1971 and 1972 disallowed $49,741.41 and $39,057.91, respectively, of the claimed contributions with the explanation that of the contributions claimed for the year 1971 only *428 $8 was allowable, and of the contributions claimed for 1972 only $2,004 was allowable. Among the disallowed contributions was the value of the various coins donated by Jon to the Field Museum of Natural History and Loyola University of Chicago. Respondent in his notice of deficiency to Paul W. Holtzman and Valerie Holtzman for the year 1972 disallowed the entire claimed amount of $20,687 for contributions of other than cash with the explanation that it had not been established that any amount claimed as contribution of property was a proper deduction or expended for the purpose designated. OPINION Although respondent initially disallowed all of the claimed deductions by each petitioner for charitable contributions of coins, he now recognizes that Jon did contribute the coins he claimed to have contributed to the Field Museum of Natural History in 1971 and did contribute to Loyola University of Chicago the coins he claimed to have contributed in 1972. Respondent also recognizes that petitioners jointly contributed in December 1972 to Loyola University of Chicago the coins they claim to have contributed. Respondent has conceded that there is no addition to tax under section *429 6653(a) and the parties have agreed to the value of many of the coins contributed. However, they are in disagreement with respect to the fair market value as of the date of the gift of the 59 Radiant Heads and the 190 Eagles contributed by Jon to the Field Museum of Natural History on December 15, 1971, the fair market value as of the date of the gift of the Soli stater and the Lycia stater contributed by Jon to Loyola University of Chicago on December 15, 1972, and the fair market value as of the date of the gift of the gold stater and gold half stater contributed by Jon and Paul jointly to Loyola University of Chicago on December 9, 1972. There is no disagreement as to the dates the contributions were made and therefore no disagreement as to the dates of valuation of the various coins. The parties also agree as to the genuineness of the Radiant Heads, the Eagles, the Soli stater and the Lycia stater. However, respondent contends that the gold stater and gold half stater are forgeries. The parties also disagree as to the value of these coins even if they are not forgeries. Petitioners produced two witnesses who testified to the metals contained in the gold stater and gold half *430 stater and to the manner by which these coins were made. The metallic content of the gold half stater and gold stater, as testified to by these witnesses, is approximately the same as that shown in a report of the Smithsonian Institution attached to a letter from Dr. V. Clain-Stefanelli, Curator, Division of Numismatics, Smithsonian Institution, which was stipulated into evidence subsequent to the trial. We have made our findings as to the metal content of these coins from the Smithsonian report. However, the parties are not in disagreement with respect to the gold and other metal content of these two coins. Also, the parties agree that both coins were struck and not cast. The question for decision is the fair market value of the various coins at the date they were donated to a charitable organization. The parties also ask that we decide whether the gold half stater and gold stater are genuine coins or are forgeries. We have no evidence which enables us to arrive at any definite conclusion as to whether these two gold coins are genuine. The expert witnesses disagreed as to the genuineness of these coins. For this reason the parties agreed to submit the coins to Dr. V. Clain-Stefanelli, *431 who the parties and their experts agreed was a recognized authority in the field. As hereinafter more fully set forth, Dr. Clain-Stefanelli was unable to reach a conclusion as to the genuineness of the coins. Because we do not have satisfactory evidence of whether the coins are genuine, we will not attempt to decide this question, but will consider the evidence and opinions rendered in regard to the genuineness of the coins in connection with our valuation of the coins. Petitioners offered the testimony of two witnesses in support of their claimed valuation of the coins. One of these witnesses, Dr. Warren Moon, is a tenured associate professor of classical art and archaeology at the University of Wisconsin in Madison and is also a research curator at the Art Institute of Chicago, the Public Museum of Milwaukee, and the Elvehjem Art Center at the University of Wisconsin. This witness has a Masters Degree in Classics from Tufts University as well as a Masters in Art and Archaeology from the Oriental Institute of the University of Chicago and a Ph.D. from the University of Chicago. He is a corresponding fellow to the Societe Suisse de Numismatique and the Vereinignug der Freude Antiker *432 Kunst in Basel. He is also a fellow of the American Numismatic Society and a summer fellow of the American Numismatic Society at Columbia University.He has published articles in Numismatics and Ancient Numismatics and in The American Numismatic Society Notes and Monographs, and has reviewed literature for the American Numismatic Society in The Classical Journal. He teaches a class in artistic forgeries at the University of Wisconsin. Dr. Moon has been interested in coin collecting since his childhood days and through the various years has bought coins for his own collection. He has also advised museums with respect to the purchase of works of art and coins. He has never sold any coins, although he has attended coin shows and observed the purchase and sale of coins. During the years 1970 through 1972, he attended two or three numismatic shows each year. Petitioners' other valuation witness, Mr. Robert J. Myers of New York City, is a coin dealer. Mr. Myers started collecting ancient coins in approximately 1948. He dealt for a number of years prior to 1970 on a part-time basis in ancient coins and in 1970 began publishing his own catalog of ancient coins for sale. Since 1973 his *433 full-time occupation has been the purchase and sale of coins. He is a member or fellow of all the major museum societies and he delivered a paper at the International Numismatic Congress. Respondent's witness as to the valuation and genuineness of the coins here in issue was Mr. Joel L. Malter of Encino, California. Mr. Malter is a coin dealer who for a number of years while employed as a high school teacher of history bought and sold coins on a part-time basis. He became a full-time dealer in 1969. Mr. Malter belongs to the International Association of Professional Numismatists and a number of other professional numismatics associations, including the California Professional Dealers Association. Mr. Malter has done appraisals of coins for the Los Angeles County Museum of Arts, the Getty Museum, and the Los Angeles County Museum of Natural History. While Dr. Moon is the most educated in ancient art of any of the witnesses, he had the least qualifications of any of the three for determining the fair market value of coins. Dr. Moon showed great appreciation for the artistic qualities of the coins and was well versed in the histories of the regions from which they came. However, *434 there is no showing in the record that Dr. Moon had any broad experience in the purchase of coins and he had no personal experience in the sale of coins. He testified that he made no purchases of coins in 1971 and 1972 and he did not identify any of the types of coins he observed being bought and sold in those years. Dr. Moon was qualified to give an opinion as to the genuineness of a coin and its condition but was the least qualified of any of the three witnesses to give an opinion as to the fair market value of a coin. Both Mr. Myers and Mr. Malter were well qualified by their experience in buying and selling coins to express an opinion as to the fair market value of coins and also were qualified by their experience to give an opinion as to whether a coin was a forgery and the condition of a coin. Dr. Moon, Mr. Myers, and Mr. Malter testified to the following fair market values of the coins here involved at their respective dates of donation: Dr. Moon's
Mr. Myers'
Mr. Malter's
Coins
Values
Values
Values
59 Radiant Heads
$ 70 each
$ 75 each
$ 40 each
190 Eagles
155 each
200 each
50-80 each
1 Soli Cilician
Stater
3,000
2,500
300
1 Lycia Stater
3,000
3,000
1,000
1 Gold Stater
30,000
40,000
2,000 *
1 Gold Half Stater
10,000
20,000
50 **
*435 Of the three witnesses, we were most impressed with the reasoning used by Mr. Malter in his valuation of the various coins. For the reasons hereinafter discussed, we accept his basic valuations with certain modifications based on the conditions of the coins as testified to by Dr. Moon, the weight we give to the actual prices at which certain coins sold as shown by the record and our view that the two gold coins should be valued as being of questionable genuineness rather than as being recognized forgeries. 1. Value of the 59 Radiant Heads
Dr. Moon based his estimate of the value of the Radiant Heads of $70 each on the fact that these coins were rather common coins which he had seen sold at prices up to $90 and $100, and the fact that the Artemis Antiguities No. VIII catalog showed one such coin in very fine condition for sale at $75 and another in very fine condition for sale at $90. Later, in connection with the valuation of the Eagles, this catalog was shown to have been published in 1976. Each of the expert witnesses *436 testified to the increases in the prices at which ancient Greek coins sold during the years 1971, 1972, and 1973, and there is no indication in the record that there were not increases in the following years. Another catalog in evidence, which was a catalog published by Mr. Robert J. Myers who was one of petitioner's witnesses in this case, showed a very fine Radiant Head sold for $50 as of May 15, 1972. The catalog of Munzen and Medaillen, dated January 1972, showed a top grade (F.D.C.) Radiant Head sold for $90. The evidence shows that 4 of the Radiant Heads out of the 59 donated to the Field Museum of Natural History by Jon in December 1972 were of the very top grade (F.D'C.) and 10 were in extremely find to very fine condition. The remainder of the Radiant Head coins were in fine to very fine condition. Based on the testimony as a whole, including the listing in catalogs issued in early 1972, we conclude that 4 of the 59 Radiant Heads had a fair market value of $90 each, 10 of $75 each, and the remainder of $50 each at December 15, 1971. In our view, neither Dr. Moon nor Mr. Myers gave sufficient weight to the actual prices at which Radiant Heads were selling in or around *437 December 1971, the date of the donation. We were more impressed with Mr. Malter's valuation but in our view for the coins other than the 14 top condition coins, he did not give sufficient weight to the close to or very fine condition of the coins being valued. Considering the evidence as a whole, we have reached the above conclusion as to the value of the coins at December 15, 1971. 2. Value of the Eagles
Both Dr. Moon and Mr. Myers based their valuations of the Eagles primarily on the 1976 price of one such coin classed in extremely fine condition and another classed in very fine condition. They testified with respect to the small number of similar coins known to exist as affecting their opinion. However, the evidence shows that there were in existence a number of Rhodian coins comparable to the Eagles. The evidence also shows that there were substantial price increases in ancient Greek coins between 1971 and 1976. Mr. Myers attempted to justify his opinion on the basis that in 1971 there were only approximately 220 Rhodian Eagles known to be in existence while in 1976 250 were known to exist, and therefore this increase in number would offset the price increase per coin. *438 However, Mr. Malter pointed out that the Eagles were not unknown coins, that there had been coins of this type in the British Museum from the 1920's or the 1930's and that there were many other Rhodes coins comparable to the Eagle. In fact, he referred to some Rhodes coins that he had bought in late 1969 or 1970 at $10 apiece and sold for $25 apiece which later in 1970 sold for $75 apiece and in 1971 and 1972 were selling for $100 apiece, and at the time of the trial sold for $200 to $300 apiece. Mr. Malter referred to the condition and beauty of these coins as being superior to the Eagles here involved. Mr. Malter also testified that in 1974 or 1976 he had purchased Eagles for as little as $35 and that in 1970 or 1971 he observed Eagles and other similar coins, some of which were in more desirable condition than the Eagles here involved, on sale individually at $75 each. Mr. Malter estimated the fair market value of the 190 Eagles here involved to be from $50 to $80 each on December 15, 1971, when they were donated to the Field Museum of Natural History. Considering the evidence as a whole, and particularly the testimony of Mr. Malter with respect to his experience in buying *439 and selling Eagles, we conclude that the 190 Eagles donated by Jon to the Field Museum of Natural History on December 15, 1971, had a value of $80 each on that day. 3. Value of the Soli Stater
Dr. Moon valued the Soli stater at $3,000 and Mr. Myers valued this coin at $2,500 as of December 15, 1972. Dr. Moon based his value to a large extent on a coin listed in the auction catalog of the Bank Leu in May of 1973 at 14,500 francs ($4,924). This coin was listed as "rare, especially fine design, extremely fine." The picture of this coin in the catalog offered in evidence shows it to be in far superior condition to the Soli stater here being valued. This coin was also of an earlier period than the Soli stater here being valued. A Soli stater of the period 450-386 B.C. listed in the October 1971 auction catalog of the Superior Stamp and Coin Company, Inc., appears from its description and picture to be very similar to the Soli stater here in issue. This Soli stater was referred to as "extremely rare, choice, extra fine." In comparing the picture in the catalog of this coin with the coin here in issue it was difficult to see any distinction. As shown in the table set forth in *440 our findings of fact, this coin was offered in October 1971 for $675 and actually sold for $575. [3] The $575 which this coin brought in October 1971 was over a year before the donation of the Soli stater here in issue was made. Certainly, as the testimony shows, there had been increases in prices during that year. However, the evidence also shows that there had been a record rise in prices in the first five months of 1973 in the ancient Greek coin market. Also there is little comparison in the Soli stater sold by Bank Leu in May 1973 for $4,924 and the coin here involved except that they are both Soli staters. A review of all the catalogs received in evidence in this case shows that there is no Soli stater other than the one listed in the catalog of Bank Leu in May 1973 that sold for as much as $1,000. The record shows that while the reverse sides of the Soli stater listed for sale by Bank Leu in May of 1973 and the Soli stater here in issue are similar, the obverse sides are very different. The coin advertised by Bank Leu had a beautiful detail of an archer and is a classic Greek coin. In our view, the Soli stater could best be valued as of December 1972 by giving consideration *441 to the prices that the various Soli staters sold for in 1971, particularly the one which was almost identical to the one here in issue adjusted for the increase in the price of coins between late 1971 and late 1972, with some consideration given to the fact that a rare and extremely fine Soli stater after the escalation in prices began in 1973 did sell for almost $5,000. A comparison of the prices of coins listed in late 1971 catalogs, with those listed in 1972 and 1973 catalogs, shows a definite trend toward increased prices. However, from the testimony the indication is that the largest increases came in 1973. Certainly nothing in this record supports a finding that between late 1971 and late 1972 prices of coins doubled. A comparison of various other coins listed in the same catalog, such as the two Lycia stater coins listed in the Bank Leu catalog of May 1973, one selling for nearly three times the other, shows the primary difference in description as being the quality of the coins.[4]
*442 Considering the evidence as a whole, we conclude that the Soli stater had a value of $1,000 on December 15, 1972, when it was donated to Loyola University of Chicago. 4. Lycia Stater
All parties agree that this Lycia stater is a fine specimen of an ancient Greek coin except that it has a chisel cut that somewhat reduces its value. This coin is of an unusual design, which adds to its value. Dr. Moon and Mr. Myers both valued this Lycia stater at $3,000 and Mr. Malter valued it at $1,000. In their valuation Dr. Moon and Mr. Myers relied primarily on two Lycia staters advertised for sale in the Bank Leu auction catalog of May 1973. These two Lycia staters had approximately the same description [5] except that one was of great rarity, as well as being extremely fine, and the other was extremely fine. Dr. Moon and Mr. Myers both testified that the Lycia stater had a rarity similar to the very rare Lycia stater which sold for around $3,000 and was in a condition more comparable to that of the stater that was listed for approximately $1,000. However, there is no indication that either of the other coins had a chisel mark which would reduce its value. Also, the evidence is *443 clear that in the first five months of 1973 there had been a substantial increase in prices of coins as compared to December of 1972. In our view, there is nothing to indicate that in December 1972 the Lycia stater here in issue would have sold for the same price as the very rare and extremely fine Lycia stater advertised by the Bank Leu in May 1973. However, because of its rarity, even with its chisel mark, we conclude that it would have sold for more than the less rare Lycia stater. Considering the evidence as a whole, *444 we conclude that the fair market value of the Lycia stater at December 15, 1972, was $1,500. 5. Gold Stater
Dr. Moon valued the gold stater at $30,000 because he considered it to be a very rare coin and in fact different from any he had previously seen. Dr. Moon stated that other gold staters with which he was familiar were, he believed, of earlier date and slightly more ornate on the obverse than the donated gold stater. Also, in Dr. Moon's opinion, to a practical observer, the head of Hercules as it appeared on the donated gold stater differed in design from that on other gold staters with which he was familiar. Dr. Moon pointed to various catalogs in which other gold staters had been offered for sale that physically looked similar to the donated gold stater. Dr. Moon looked at the prices for which other gold staters sold around December of 1972, but was of the opinion that the donated gold stater was of a much rarer variety and would sell for much more than any of the gold staters sold during that period. Because of Dr. Moon's view of the rarity of the gold stater, he had at first questioned whether it was a forgery. In arriving at the conclusion that it was not a forgery *445 he was impressed by the fact that the coin was struck and by the fact that it was quite worn. In his view, it is difficult for a forger to approximate the wear that comes through usage of a coin over time. Based on his view of the rarity of the gold stater and his view of its genuineness, Dr. Moon concluded that this gold stater was worth substantially more than any gold stater sold or offered in catalogs for sale close to December 1972. In fact, his value of $30,000 was approximately three times the sales price of any stater listed in any catalogs received in evidence at the trial issued during the period 1970 through 1973. Dr. Moon was of the opinion that the rarity of the gold stater made it of extreme value even though its condition was poor. Mr. Myers, in arriving at his opinion, compared the prices of Philippi and Alexander staters as listed in the Bank Leu catalog in 1970 and the prices listed in the 1973 catalog for what he considered to be a comparable gold stater. He stated that the price increase in similar gold staters between the two catalogs was 15 or 16 times, [6] which he later corrected to 8 times. He then pointed to a Philip II gold stater sold in 1970 and *446 stated that the coin was not as rare as the one he was valuing so he felt that the 1970 price of the coin he was valuing would have been at least twice the amount of the less rare Philip II stater and that the increase from 1970 to December 1972 would be eight or ten times and in that method arrived at a value of $40,000. Mr. Myers made no comment about what consideration, if any, he gave to the condition of the coin, although all of the witnesses recognized its condition was poor. Mr. Myers accepted the fact that the coin was genuine and not a forgery in his valuation. *447 Mr. Malter questioned the authenticity of the coin but stated that in his opinion if the coin were genuine its value would be $2,000. Mr. Malter based this opinion on various other gold staters which had been sold from the auctions advertised in the various catalogs in the record which were in fine condition as compared to the poor condition of the donated gold stater, but, if the donated gold stater were genuine, were less rare. Mr. Malter was of the opinion that the question of the genuineness of the gold stater would greatly affect the price that might be paid for it. Because of the questioning of the genuineness of this coin, and also the contention of respondent that the gold half stater was a forgery, as heretofore stated, the parties submitted the coins to Dr. V. Clain-Stefanelli, Curator, Division of Numismatics, Smithsonian Institution, who is a recognized authority on ancient Greek coins for his opinion as to the authenticity of the coins. When Dr. Clain-Stefanelli examined the coins he reached the conclusion that the genuineness of the coins was subject to personal interpretation and had the Smithsonian Institution analytical laboratory conduct tests on the coins *448 to assist him in reaching a conclusion. The results of the tests conducted by the laboratory were attached to a letter from Dr. Clain-Stefanelli which was stipulated by the parties into evidence. [7] The summary of the tests run by the Smithsonian laboratory contained the following statements with respect to the gold stater: *449 The surface of the coin is so damaged that its original condition can nowhere be seen. We have found no positive evidence that the coin is not authentic. At the conclusion of the statements in this report of the results of the laboratory tests and microscopic examination of the coin prior to the summary statement, the report states: According to the above evidence the coin may be genuine. In our view a knowledgeable purchaser would not pay a sum approaching $30,000 or $40,000 for a coin in very poor condition and of questionable authenticity. Because of the rarity of the design of the coin, some knowledgeable purchaser might be willing to pay as much as he would pay for less rare coins with the thought that ultimately, when positive identification of the antiquity of coins could be made, the coin might prove to be genuine and therefore far more valuable than the amount paid for it. Certainly we do not decide, since the experts were unable to, whether in fact the coin is genuine or a forgery. However, from the evidence of amounts paid around 1972 or 1973 for known genuine Macedonian gold staters in much better condition than this coin, we have determined the amount in *450 our opinion that a knowledgeable, willing buyer would have paid a knowledgeable, willing seller for the coin. We have made this determination on the basis that the coin was questionable but since no positive proof could be obtained of its lack of genuineness, it might be authentic. Considering all of these facts and the 1972 and 1973 prices of known genuine Macedonian gold staters of around the time that it is claimed that the donated gold stater dated, we conclude that the fair market value on December 9, 1972, of this gold stater was $3,000. 6. Gold Half Stater
The gold half stater is more difficult to value than the gold stater. There was produced at the trial a known forgery in a silver coin which in appearance was only slightly different from the gold half stater. The silver forgery was slightly larger, was a cast and not a struck coin, and the grapes on the reverse of the coin were slightly larger. The similarity of the known forgery to the gold half stater would raise questions in the mind of any purchaser. As Mr. Malter testified, museums and a number of coin collectors keep cabinets of forgeries for comparison with other coins. Also the report of the laboratory *451 of the Smithsonian Institution with respect to the gold half stater made no reference to whether the evidence indicated that the coin might be genuine or even whether the laboratory tests showed evidence of a lack of genuineness of the coin. Dr. Moon, in support of his opinion that the gold half stater was worth $10,000, referred to a coin from Thrace which was sold by the Bank Leu at the May 1973 auction for $8,150. Although Dr. Moon called this coin comparable to the gold half stater, the description of the coin in the catalog is a gold stater and its weight of 8.46 grams as shown in the catalog bears out the fact that it was in fact a stater rather than a gold fraction coin or half stater. This coin was described in the catalog as "of great rarity; very fine to extremely fine." Dr. Moon in his testimony stated that the gold stater from Thrace which sold for over $8,000 was a common coin from Northern Greece in similar condition to the gold half stater which in his opinion was unique. In fact, he testified that he had encountered no other coin of that design and he suspected that a mold had been made from the gold half stater from which the forged silver coin was cast. Mr. *452 Myers, however, in making his evaluation of the gold half stater did compare it with certain gold fraction coins shown in the various catalogs which are in evidence. One of the comparisons he used was with a gold fraction coin listed in the Bank Leu April 1972 catalog as being from the City of Thasos which sold for $8,686. He also compared it with a gold Greek stater from the City of Pantikapaion which sold at the same auction for $10,395. The gold fraction coin to which Mr. Myers compared the gold half stater here involved was described as "of great rarity and finest style -- magnificent specimen." Mr. Myers recognized that the gold stater from Pantikapaion which sold for $10,395 was heavier than the gold half stater here involved. In fact, the record shows that the Pantikapaion gold stater weighed 9.08 grams, over 2-1/2 times the weight of the gold half stater here involved. Mr. Myers stated that the Pantikapaion stater was not unique as was the gold half stater, that in fact during the time that he had been obtaining Bank Leu catalogs, Bank Leu had sold in their auctions about a half dozen of these coins. Mr. Myers, however, considered this coin to be a good comparison to *453 the gold half stater since it was a very desirable coin in fine condition "which every collector would very much like to own." Mr. Myers testified that although Bank Leu called the coins to which he had compared the half stater of great rarity, they did not call either of those coins "unique, previously unknown, and unpublished." Mr. Myers further testified that not every collector out of the approximately 500 serious collectors with whom he had dealt would pay a "tremendous premium for the fact that a coin is unique; that a coin is unpublished," but that this fact is of importance to many collectors since it gives them a chance to publish for the first time in a scientific journal a coin from their own collection. In his view, for this reason certain collectors would pay a great premium to own a unique coin. Neither Dr. Moon nor Mr. Myers gave any consideration to the fact that the genuineness of the gold half stater was questionable. Neither of them disputed the opinion of Mr. Malter that if the gold half stater were a forgery its value would be the approximate value of the gold it contained. In our view a serious collector would question, as did Mr. Malter, the genuineness of *454 this coin particularly with the knowledge of the existence of silver forgeries closely resembling this coin. [8] When an analysis such as was made by the Smithsonian could not establish the genuineness of the coin, in our view no knowledgeable buyer would be willing to pay an amount even closely approximating the amount paid for a very rare gold coin of proven genuineness. In our view, however, a knowledgeable purchaser would be willing to pay substantially more than the value of the gold content of the coin on the chance that at a later date it might be possible to definitely establish whether the coin was genuine or a forgery. We therefore conclude that the fair market value of the gold half stater on December 9, 1972, was $1,500. The record is completely silent as to when and for what price the two gold coins were acquired by petitioners. It is of course petitioners' burden to establish the fair market value of the coins here involved. Certainly the price which petitioners paid, particularly if as in the case *455 of the Radiant Heads and Eagles it was a year or more earlier than the date of the donation, would not necessarily indicate the value of the coins at the later date. However, the place and circumstances under which petitioners acquired these gold coins as well as the price they paid for them might give some indication of the value of these coins and their genuineness. Because of the lack of any testimony as to how and when and for what price these coins were acquired, we must assume that such evidence would not be beneficial to petitioners. If petitioners acquired these coins from a source other than a reputable dealer with no guarantee of their genuineness, a greater question as to their genuineness would exist to a prospective purchaser than had petitioners acquired the coins from a reputable dealer who represented them to be genuine. We do not by this suggest that the fact that they were represented to be genuine by a reputable dealer without some authentication of their genuineness would necessarily prove the coins to be genuine or that the fact that they may have been acquired from a person other than a reputable dealer for a very low sum woul be proof of their lack of genuineness. *456 In our view, however, when the issue of genuineness of the coins was raised and petitioners still chose not to disclose when, how, from whom, and for what price they acquired the coins, a greater question exists as to their genuineness. Certainly a prospective purchaser of the coins would want at least the information from whom and under what circumstances petitioners had acquired the coins, even if they had been acquired by petitioners at a price which petitioners were unwilling to disclose. The catalogs received in evidence indicate that the most reputable coin dealers, such as Bank Leu, publish not only their estimate of the price that a coin will bring in their auction but also publish for the information of the public the price the coin actually brings at auction. Had these coins been acquired by petitioners at an auction such as that of Bank Leu, the description of the coins, the estimated price and the price brought at the auction would be of public record. Considering the evidence of record as a whole, we have reached the conclusion above stated as to the amount a knowledgeable willing buyer would pay a knowledgeable willing seller for each of the coins here involved at *457 the date each of these coins was donated to a charitable organization. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Paul W. Holtzman, Docket No. 2775-76; Jon Holtzman, Docket No. 2776-76.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue unless otherwise stated.↩
*. Weight not provided in grams. ** Approximate value. Coin not sold.↩
*. Weight not provided in grams.↩
*. Mr. Malter questioned the genuineness of this coin but valued it as if it were genuine. ** In Mr. Malter's opinion this coin was a clear forgery.↩
3. The catalog description of this coin is as follows: SOLI -- 450-386 B.C. AR Stater. Head of Athena r., wearing necklace and crested Athenian helmet, on which griffin r. Rev. Bunch of grapes with one tendril and one leaf. An opportunity to purchase a superb specimen of an EXTREMELY RARE coin. Choice Extra Fine and a prize. PHOTO ($675.00 --) ↩
4. The following is the description of a Lycia stater listed in the Bank Leu catalog of May 1973: Unbestimmte Dynasten Stater um 500. Eberprotome n. 1. Rs. Vertieftes Quadrat mit drei Einbuchtungen und zwei sich kreuzenden Linien. Vgl. Traite I Tf. 21, 4. SNG v. A. 4049. Boston 2080 var. 9,05 g. Prachtexemplar. [8,500 francs ($2,886)] Stater um 490.Eberprotome n. 1., auf der Schulter KV. Rs. Vertieftes Quadrat mit unregelmassiger Oberflache. Traite I Tf. 21,9 (gleicher Vs-Stempel). SNG v. A. 4045. Vgl. SNG Lockett 2990. 9,47 g. Vorzuglich. [3,000 francs ($1,019)] While these descriptions are in German, the reference was made to the items at the trial and the evidence is clear that the major difference in the items is the quality.↩
5. The following is the description of two Lycia staters listed in the Bank Leu catalog of May 1973: Unbestimme Dynasten Stater um 450. Nach 1. sitzender Lowe mit erhobener r. Vordertatze, den Kopf leicht umgewendet. Rs. Pagasosprotome n. r. in vertieftem Quadrat mit Perlrand. Traite II Tf. 95, 21 (=Babelon, Perses Achemenides, Tf. 12, 4). 9,32 g. Von grosser Seltenheit, bisher nur in einem Exemplar publiziert. Vorzuglich. Khin… Stater um 450. Pegasos auf Rundschild n. 1., darunter Punkt. Rs. Triskelis in vertieftem mit Perlrand. Traite II Tf. 95, 7 (gleicher Vs-Stempel). SNG v. A. 4089. Vgl. SNG Berry 1170-1172. 9,92 g. Vorzuglich.↩
6. The prices listed in the catalogs and the description of the coins do not support this conclusion. A Philip II extremely fine stater listed in the Bank Leu 1970 catalog sold for $409 and a Philip II F.D.C. listed in the Bank Leu 1973 catalog sold for $6,791. However, as set forth in our findings, F.D.C. is a higher grade than extremely fine. Other comparisons given by the witness of the 1970 gold stater of $492 as compared to the 1973 price of $2,377 for an Alexander III extremely fine stater shows more nearly a five-time increase between the two catalogs. Mr. Myers made no reference to the Philip II Macedonian gold stater listed in the April 1972 Bank Leu which sold for $883. Mr. Myers gave no recognition of the amount of any price increases which might have occurred in the first five months of 1973.↩
7. The body of Dr. Clain-Stefanelli's letter, in full, is as follows: I should have written to you long before this, regarding the two gold pieces attributed to Philippi and Thasos (?), respectively. I faced, however, a series of problems in reaching conclusions which could be fully supported by facts rather than opinions of a more or less personal nature. I thoroughly re-examined all of the elements of a historical as well as stylistic nature and reached the conclusion that they were subject to personal interpretation and, ultimately, of little use in a Court of Law. I, therefore, asked the Smithsonian Institution's analytical laboratories to conduct any tests that may assist us in reaching a conclusion. Attached are the results and, without going into any details, the one statement stands out "According to the above evidence the coin may be genuine". Essentially, this ends any further discussion, since my own contention that in time we may be in a position to establish the age of metallic artifacts based on an examination of the reorientation of the molecules due to annealing processes under ambient conditions, is far from being more than an unproven theory. I regret it very much that it has taken us so long to reply to your request, but I would rather be wrong in refusing to condemn a piece than contribute to the elimination of any artifact that may be genuine after all. As a matter of fact, I consider it a crime to condemn coins or any other artifacts without being in a position to bring unassailable scientific proof. The two coins were returned to the Loyola University of Chicago without any comment regarding the laboratory findings.↩
8. Mr. Myers testified that he had seen silver forgeries closely resembling the silver coin produced at the trial which all of the witnesses agreed was a forgery.↩